# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE A. WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:07CV1597 MLM |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue ("Defendant") denying the application of Michelle A. Washington ("Plaintiff") for a Period of Disability and Disability Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. § § 401, et seq., 1381, et seq. Plaintiff filed a brief in support of the Complaint. Doc. 15. Defendant filed a brief in support of the Answer. Doc. 19. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. §636(c)(1). Doc. 17.

### I.
### PROCEDURAL HISTORY

On April 19, 2000, and August 22, 2000, Plaintiff filed applications for benefits, alleging an onset date of March 1, 1999. Tr. 149-154. The applications were denied initially on March 22, 2001. Tr. 60-64. In November 2001 a hearing was held before Administrative Law Judge ("ALJ") Robert G. O'Blennis, who issued a decision on October 24, 2002, denying Plaintiff benefits. Tr. 60-64, 37-47. On July 10, 2003, the Appeals Council denied Plaintiff's request for review. Tr. 131-33. Plaintiff

sought judicial review of the ALJ's decision. The district court reversed and remanded the matter pursuant to a motion filed by the Commissioner.[1] Tr. 48-53. On May 24, 2005, a second hearing was held before the ALJ, who denied Plaintiff's application for benefits by decision dated July 22, 2005. Tr. 590-636, 16-29. On July 17, 2007, the Appeals Council denied Plaintiff's request for review of the second decision of the ALJ. Tr. 9-11. Thus, the July 22, 2005 decision of the ALJ stands as the final decision of the Commissioner.

## II.
## TESTIMONY BEFORE THE ALJ

A.    **Plaintiff's Testimony at the November 2001 Hearing:**

At the November 2001 hearing Plaintiff testified that she was 39 years old; that she and her son lived with her mother; that they had lived with her mother since 1999; that at the time of the hearing she was six months pregnant; and that her doctors were going to deliver the baby after she reached thirty-five weeks because they did not want to risk her going into labor. Tr. 104.

Plaintiff further testified that at the time of the hearing she was working at "Countree," where she answered phones and filled out forms; that she began working at Countree in August 2001; that between April 2000 and June 2000 she worked for the State of Missouri at the St. Charles Rehabilitation Center, where she worked with mentally disabled adult men; that she left the St. Charles Rehabilitation Center because it was "too stressful, too physical"; that in 1999 she worked for a temp agency; that for 11 months between 1997 and 1998 she worked as a "roll-top" operator at Aramark; that in 1992 she worked at a halfway house where she monitored the comings and goings of residents and prepared meals; that in 1992 she also worked for the city of St. Louis as a correctional officer; that she quit the job as a correctional officer because she lost a child; that

---

[1]    Upon reversing and remanding the district court ordered that the record be more completely developed.

between 1987 and 1991 she worked for J & M Sales as a clerk; that she quit the job at J&M because she decided to go to school full time; and that after quitting work at J&M she returned to work there. Tr. 81-88.

Plaintiff also testified that she had a heart attack in March 1999; that she did not attend prescribed cardiac rehabilitation because she had no transportation after her car got stolen; that before her heart attack she was able to survive financially because she and her fiancé were working and her mother would help them; that after her heart attack she moved in with her mother and was on "AFDC"; and that she received a stent placement in 2000 at Barnes Jewish Hospital. Tr. 92-93.

Plaintiff testified that prior to the stent placement she spent her days reading books; that at the time of the hearing she was driving "a little bit"; that since her heart attack she visited doctors' offices, went to church, her son's soccer games, her mom's and aunt's houses, and the movies with her son; that she is an early riser due to her sleep apnea condition, for which she sleeps with a C-PAP machine; that she helps her son get to school in the morning; and that since her heart attack she had been taking naps almost every day and had been able to attend to her personal needs. Tr. 94-100. Plaintiff further testified that she has "always been heavy, big-boned, and heavyset"; that she did not use an assistive device such as a cane; and that she occasionally used a wheelchair. Tr. 104.

Plaintiff testified that she experienced chest pain after her heart attack as frequently as once or twice a week; that the pains would sometimes awaken her out of her sleep; that she did not need to be doing anything in particular to bring on the pain; that using "nitro" helped with the pain most of the time; and that she had periodic swelling and pain in her legs. Tr. 101-03.

**B.      Plaintiff's Testimony at May 2005 Hearing:**

Plaintiff testified that, at the time of the May 2005 hearing, she was 42 years old; that she was living in her mother's house with her two children, aged three and eleven; that she had completed her

second year of college; that she had not gone through any vocational or technical trade schools; and that she had trained to work with Central Assault Response Team, for which she received a certificate. Tr. 594-98.

Plaintiff testified that she could not work because she had severe chest pains, continuous headaches due to high blood pressure, and shortness of breath; that she could not sit for very long because her legs hurt; that she had experienced the chest pain and the shortness of breath since 1999 and the headaches for the "last couple years or so"; that the leg pain began in 2000 or 2001; that her chest pains come without warning; that she wakes up in the middle of the night with chest pain; that she does not participate in activities a lot of times due to her headaches; and that she has "no control" over her symptoms. Tr. 599, 616-17.

Plaintiff further testified that she was last employed in January 2002 as an administrative assistant; that her duties as an administrative assistant included scheduling appointments, "intake, computer input, and charts"; that she left the job as an administrative assistant after four to five months because "it got to be too much" in that she was eight months pregnant and having lots of chest pains; that at the time she left her administrative assistant job she was seeing doctors every three days; and that these doctors included a cardiologist, an OB/GYN, and residents and interns at a clinic. Tr. 597-603.

Plaintiff also testified that since May 2002, after which time her daughter was born, she had weighed 260 pounds; that she weighed 190 to 195 pounds prior to her pregnancy; and that she was on a low calorie diet. Tr. 598.

Plaintiff testified that she takes Benicar, Lisinopril, and Hydrothorochlorozide for her blood pressure; that takes Cartia, Isoborodine, and NitroQuick for her heart; that the NitroQuick usually takes care of her chest pain; that she takes Vitorium and Niaspan for cholesterol; that she takes

Florisimide, aspirin, Paxil CR, Seroquel, Buproprion, Trazadone, Restoril, and fish oil; that she takes Motrin for her headaches; that the Motrin does not generally help relieve her headaches; that she smokes; that she does not drink; and that she does not do cocaine. When asked if she had been hospitalized in the prior two or three years, Plaintiff responded that she had not been because she could not "afford to go into the hospital." Tr. 604-609, 617, 620.

Plaintiff also testified that when she wakes up in the morning, she irons her son's clothes and fixes him breakfast; that her daily chores include making the bed, scheduling doctors' appointments, tidying the house, and washing; that she occasionally goes on walks with her daughter; that she sometimes drives to the grocery store; that she occasionally takes her son to the movies; that she goes to church twice a week; that she is on the church Hospitality Committee on which she helps serve food at church dinners; that she attends her son's school functions; that she or her mother transport him to after school programs; that she attends her son's baseball games; that she and her son go to the library once a week; that she does not socialize much; that she has not "really had a vacation"; and that her mother helps out with taking care of her children and her finances. Tr. 610-16.

Plaintiff further testified that some days she feels worse than others; that she does not wear a brace or use a cane, stick, crutch or walker; and that when she wakes up in the morning she is stiff and she stretches. Tr. 610-14, 616.

**B.    Medical Expert Dr. Morris Alex's Testimony at May 2005 Hearing:**

Morris Alex, M.D., stated that he was a retired board certified internal medicine specialist and that fifty percent of his practice for many years was in cardiovascular medicine. Dr. Alex testified that Plaintiff did not meet any of the "listings"; that her body mass index is 43 with a height of 66 inches and weight of 263 pounds; and that Plaintiff's functional capacity "does not meet what [Dr. Serota] has examined her for and what the clinical tests show." Dr. Alex further testified that there was a

discrepancy between what symptoms Dr. Serota listed in his treatment notes and what he reported in Plaintiff's history; that there is no indication by any of Plaintiff's doctors that there are limitations on Plaintiff's standing or walking; and that he had not seen anything in the treatment notes regarding limitations on the ability to lift or carry objects, or limitations on twisting, stooping, crouching or climbing ladders, except "in this one that [Dr. Serota] evaluates here." Dr. Alex also testified that Plaintiff should not be climbing ladders due to her weight; that she should avoid "obnoxious odors" due to her weight and her history of coronary artery disease and coronary spasm; and that concentrated exposure to extreme temperatures, including humidity, should be avoided due to her heart condition. Tr. 618-25.

Dr. Alex testified that Plaintiff would have difficulty lifting more than 10 pounds due to her weight; that Plaintiff would be able to stand and/or walk for six hours a day with regular breaks; that he did not believe there should be a problem with Plaintiff's sitting for long periods of time because there was no longer any indication that Plaintiff was suffering from edema; that climbing stairs and ramps would be reasonably difficult due to Plaintiff's weight; that climbing ladders, ropes and scaffolds should be avoided; and that there was nothing in Plaintiff's records to indicate that she would have trouble with reaching, handling, fingering or feeling. Tr. 622-27.

Dr. Alex further testified that Plaintiff's identifiable impairments include hypertension, ischemic heart disease, and sleep breathing disorder, and that the impairments are consistent with symptoms that Dr. Serota assessed. Tr. 628.

## C.  Vocational Expert Brenda Young's Testimony at May 2005 Hearing:

Vocational Expert ("VE") Brenda Young testified that Plaintiff's past work as an administrative assistant was semi-skilled and sedentary; that her position as a clerk and an office manager was semi-skilled and medium as she performed the job; that her job as a corrections officer

at the half way house was light work and also semi-skilled; that her position as a roll towel operator was un-skilled and medium; and that her job as a client aide to the disabled individuals was unskilled and heavy. VE Young testified that the job as a corrections officer was defined as light in that the work consisted of primarily doing paperwork and finding out where inmates were and making sure they were released and put in different areas; and that this could also be considered sedentary work. VE Young testified that Plaintiff has transferable skills to positions considered to be "lighter than light" and that these would include clerical positions. VE Young further testified that given all the restrictions on Plaintiff's ability to work based on the testimony of Dr. Alex, a hypothetical individual could have performed the administrative assistant and clerk jobs as Plaintiff had described them, and that these positions would likely also be considered sedentary. Tr. 629-31.

VE Young considered a hypothetical concerning an individual as follows: the same age, education and work experience as Plaintiff; limited to lifting ten pounds; has the ability to stand and/or walk six hours in an eight hour work day with normal breaks; has the ability to sit at least eight hours with normal breaks; has the limitation of occasionally climbing ramps or stairs; can never climb ladders, ropes or scaffolds; has the ability to occasionally balance, stoop, kneel, crouch, or crawl; has the limitation of avoiding concentrated exposure to extreme cold, heat, wetness and humidity, as well as obnoxious environments that involve concentrated exposure to fumes, odors, dusts, and gases; and has the limitation of avoiding working at dangerous heights and around unprotected machinery. Tr. 629-31.

VE Young, testifying under the assumption that the administrative assistant position could be considered past relevant work, stated that working as a receptionist or a customer service representative would also be possible given Plaintiff's conditions posed in the hypothetical, and that there were 10,000 receptionist positions and 3,000 customer service representative positions in the

St. Louis Metro area, and twice as many of each in the state of Missouri as a whole. If the added restriction of simple and/or repetitive work was added, VE Young testified that these jobs would no longer fit the parameters, and that there were 2000 un-skilled sedentary assembly jobs in the St. Louis Metro area, with possibly 3000 available in all of Missouri. VE Young testified that if a hypothetical individual with the restrictions of Plaintiff was also limited to working in positions that did not require close interaction with the general public, this added restriction would prevent the individual from working as a receptionist or a customer service representative and that it would not prevent the individual from working in one of 2000 un-skilled labor positions she referenced. Tr. 631-33.

When questioned by Plaintiff's attorney, VE Young was asked about an individual who is markedly limited in physical activity and incapable of performing low stress jobs; whose attention and concentration are frequently interrupted; who cannot stand or walk for more than two hours or sit for more than eight hours; who cannot lift more than 10 pounds; who cannot twist, bend, crouch, squat or climb ladders or stairs; who has been directed to avoid all environmental exposures; and who would have to miss four days a month due to her impairments. VE Young testified that such an individual would not be capable of performing any of Plaintiff's past work or any other work. Tr. 633.

### III.
### MEDICAL RECORDS

Records of Christian Hospital Northeast-Northwest ("Christian Hospital") dated on March 4, 1998, reflect that Plaintiff was admitted to the emergency room complaining of head congestion, facial pain, drainage, sore throat and earache; that Plaintiff had been seen on March 2, 1998 for flu-like symptoms which had worsened; that her blood pressure was first 185/105 and 150/85; that her pulse was 100; that Plaintiff was diagnosed with acute sinusitis and bilateral otitis media; and that Plaintiff was discharged with medication for her symptoms. Tr. 300

Records from the JFK Clinic in St. Louis reflect that Plaintiff was seen on May 27, 1998, complaining of diarrhea, intermittent lower back pain and intermittent epigastric pain and that she had no fever, nausea or vomiting. Tr. 285.

Records of the JFK Clinic reflect that Plaintiff was seen on February 11, 1999, at which time her weight was 211 pounds, her blood pressure was 140/90, and her pulse was 80; that Plaintiff was at the clinic for "flu"; that her blood pressure was stable; that Plaintiff was smoking a pack of cigarettes a day and "still drinking a significant amt of beer lately"and "hasn't been to AA meetings lately"; that it was determined that Plaintiff would continue Procardia for her hypertension and start Wellbutrin for her tobacco abuse; that she was instructed to increase her exercise; and that "otherwise [Plaintiff was] doing ok." Tr. 286-87.

Records of Christian Hospital reflect that, Plaintiff was admitted on March 9, 1999, complaining of severe chest pain; that based on the cardiac cath lab report she had mild left ventricular dysfunction secondary to small area anterolateral akinesis compatible with infarction, insignificant coronary artery disease, moderate systemic hypertension, and moderate elevation of left ventricular diastolic pressure compatible with decreased left ventricular compliance; that Plaintiff's blood pressure was 124/82; and that Plaintiff was discharged on March 13, 1999, with a diagnosis of "non Q wave myocardial infarction" and "left ventricular dysfunction, mild." Tr. 312-17.

Records of JFK Clinic dated March 18, 1999, reflect that Dr. Edward Weiss, a cardiologist, had a "cath done" which showed "minimal damage"; that Plaintiff had been taken off a "home monitor" the day before the visit; that Plaintiff's "MI" was "stable"; that her hypertension stabilized with medication; and that she was encouraged to discontinue tobacco use. Tr. 288.

Dr. Weiss reported on March 31, 1999, that Plaintiff's status was post-myocardial infarction and that Plaintiff's diagnosis was ischemic heart disease and hypertension. Tr. 309.

Records of the JFK Clinic reflect that Plaintiff was seen on April 16, 1999; that Plaintiff was suffering intermittent chest pain; that a new cath report showed mild left ventricular dysfunction; that Plaintiff had not taken her hypertension medications for several days prior to this visit; that she needed to keep her blood pressure under control by taking her medications; that her hypertension was under control with medication; and that she was abusing tobacco and encouraged to stop taking Wellbutrin. Tr. 289.

Records reflect that on May 4, 1999, Plaintiff was prescribed cardiac rehabilitation with a diagnosis of post-myocardial infarction. Tr. 290.

Records of the JFK Clinic dated June 3, 1999, reflect that Plaintiff presented complaining of chest pain; that Plaintiff reported that she had not been to her rehab appointments because it was "too far to drive"; that Plaintiff's status was post-myocardial infarction with "minimal dz [at] this point"; that her hypertension was well controlled; that her tobacco use was down to a "few cigs" per day; and that her cholesterol was 275. Tr. 291.

Records from Weaver & Associates Counseling Services, Inc., reflect that Plaintiff saw S. Weaver, LCSW, once a month for three months, starting on January 27, 2000. Treatment notes state that Plaintiff appeared depressed and was struggling in her relationships with her mother and her son; that Plaintiff did not see her son during the week while he lived with Plaintiff's mother; that Plaintiff had an alcohol problem which would occasionally result in her blacking out; and that she had been to support groups in the past. Tr. 341-43.

Records of Hillard Scott, M.D., dated July 14, 2000, reflect that Plaintiff was seen for a Depo-Provera shot; that Plaintiff complained of a bad cough, that her back and right side were bothering her and that she was unable to sleep for the previous two nights; and that Plaintiff's blood pressure was 118/88. Tr. 345.

Dr. Scott's records of September 28, 2000 reflect that when Plaintiff returned for her next Depo-Provera shot, she had the smell of alcohol on her breath and that alcoholism was discussed with her. Tr. 346.

Records from the DePaul Health Center reflect that Plaintiff was admitted on August 23, 2000, for alcohol detoxification; that upon admission Plaintiff complained of having chest pain almost every day; that Plaintiff had a history of hypertension, hyperlipidemia, tobacco abuse, and alcohol abuse; that Plaintiff was smoking one and a half packs of cigarettes a day and admitted to significant alcohol use; and that her blood pressure was 117/65 at this visit. Sundeep Das, M.D., reported that Plaintiff's chest pain was of uncertain etiology; that the chest pain may have been secondary to coronary artery disease; that it was not exertional; that the chest pain may have been related to some degree of reflux associated with Plaintiff's history of peptic ulcer disease; that an EKG was "fairly unremarkable" and did not show any massive previous myocardial infarctions; and that Plaintiff's hypertension was "fairly well controlled" with medication. A report states that a treadmill stress test was carried out and that Plaintiff was unable to reach her target heart rate; that Plaintiff did not complain of chest pain; that no diagnostic ST segment abnormalities were noted; that there were no arrhythmia; that blood pressure response was appropriate; and that the impression from these tests included "negative for chest pain" and a poor exercise tolerance. Tr. 334-37.

Records from Christian Hospital reflect that Plaintiff was admitted on September 7, 2000, with angina pectoris; that upon release on September 10, 2000, Plaintiff was diagnosed with coronary artery disease, severe documented coronary artery spasm, hypertension, hyperlipidemia, tobacco use and obesity; that while in the hospital, Plaintiff underwent a left heart catheterization with selective coronary angioplasty, left ventriculography and stent implantation of LAD; that Plaintiff underwent a second catheterization on September 8, 2000, with angioplasty of the circumflex; and that the

catheterizations resulted in a diagnosis of severe single vessel coronary artery disease which includes an 80-90% stenosis of the mid LAD, total occlusion of the division of the first diagonal branch, 50-60% diffuse stenosis of the left circumflex, diffuse disease of the RCA and total occlusion of the right ventricular branch, and mild left ventricular systolic dysfunction with wall motion abnormalities and an ejection fraction of 40%. Tr. 352-57.

Records from Christian Hospital further reflect that Plaintiff was admitted on October 9, 2000, with ongoing and increasing chest pain for three to four days; that Plaintiff did not have a myocardial infarction; that a cardiac catheterization was performed because the pain was not responding to medication; that the catheterization showed "excellent" results from recent stent placement; that Plaintiff's circumflex was normal; that there was slow flow phenomenon in the right coronary artery; that left ventricular function was normal; and that the catheterization showed elevated left ventricular end diastolic pressures and systemic hypertension. Dr. Das noted that chest pain was likely of GI etiology; that cardiac etiology could not be ruled out due to Plaintiff's history of coronary artery spasm and ongoing smoking habit; and that it was possible that Plaintiff's chest pain was due to microvascular disease, Syndrome X coronary artery spasm, or slow flow phenomenon in the right coronary artery. Records reflect that Plaintiff was discharged with a diagnoses of chest pain, coronary artery disease, history of coronary artery spasm, mild cardiomyopathy with ejection fraction of 40%, tobacco use, hyperlipidemia, and alcohol use and that she was instructed to stick to a diet low in salt, fat and cholesterol, and high in fiber. Tr. 374-82.

Records of Christian Hospital dated November 6, 2000, reflect that Plaintiff was transported there by ambulance, complaining of substernal chest pain and that she was discharged that same date. The impression of Harvey Serota, M.D., on this date was atypical chest pain, history of left leg pain and chronic deep venous thrombosis in the left leg, history of severe coronary artery spasm,

hypertension, tobacco use, hyperlipidemia, obesity, and history of alcohol use. Dr. Serota reported that Plaintiff's chest pain was non-cardiac. Records of this date further state that Plaintiff was advised to stop smoking; that her prescriptions for hypertension were adjusted; and that she was prescribed with Zocor for her hyperlipidemia. Tr. 407-13.

The impression of Joshua S. Glaser, M.D., from a November 6, 2000 venous color duplex examination of the bilateral lower extremities was that there was no evidence of acute deep venous thrombosis bilateral lower extremities and that there was chronic deep venous thrombosis involving the left posterior tibial vein with recanalization. Tr. 423-37.

Records from the St. Louis Heart and Vascular Medical Center of Christian Hospital reflect that Plaintiff presented on November 6, 2000, complaining of chest pain with shortness of breath since three to four that morning and that the assessment from this visit was chest pain with history of coronary artery disease and stenting, left leg pain, edema, abdominal discomfort with diarrhea, increased cholesterol levels, tobacco use, obesity, hypertension, and a history of noncompliance. Tr. 404-405.

Records of Barnes Jewish Hospital reflect that Plaintiff was admitted on December 20, 2000, complaining of intermittent chest pain since the night before, with little relief from nitroglycerin; that a portable AP chest radiograph performed on December 20, 2000, demonstrated clear lungs bilaterally, no infiltrate, effusion or pneumothorax, normal cardiac silhouette and pulmonary vasculature, normal mediastinum, and no fractures; that the impression from a cardiac catheterization performed on December 22, 2000, was "early atherosclerosis but no significant coronary obstructions" and "widely patent left anterior descending stent with 30-40% outflow"; and that the recommendation was "continued medical management and risk factor reduction." Tr. 440-450.

Records of Dr. Serota reflect that Plaintiff presented on January 17, 2001, complaining of weakness, fatigue, night sweats, chills, change in weight and appetite, visual changes, tinnitus, deafness, taste, hoarseness, abnormal olfactoin, sinusitis, post nasal drip, photosensitivity, nail changes, incoordination, abnormal sensation, decreasing mentation, syncope, stroke, joint pain, swelling stiffness recent trauma to joints, myalgia, muscle weakness, leg cramps, back pain, limitation of range of movement, depression, anxiety, sleep disturbances, wheezing, coughing, excessive sputum production, night sweats, hypertension, chest pain, DOE, PND, dysphagia, nausea, vomiting, abdominal pain, diarrhea, constipation, gas, hemorrhoids, food intolerance, easy satiety, antacid use, and laxative use; and that Plaintiff's blood pressure was 132/96 and her pulse was 87 and regular. Dr. Serota's impression was that Plaintiff was "doing well"; that she might be over medicated; that she had high cholesterol which was being treated with Zocor; that she had coronary spasm that was under treatment; that her hypertension was "O.K"; and that he was going to send her for a sleep study and have her consider taking Xenical for her obesity and snoring. Tr. 455.

February 5, 2001 notes of W. Bruce Donnelly, M.D., reflect that at the time of her most recent catheterization, Plaintiff's coronary arteries "looked fine and the LAD stent was patent." Dr. Donnelly noted that Plaintiff's chest pain was "atypical" and that "she is capable of a full range of light work." Dr. Donnelly's March 7, 2001 notes state that "there is no documented heart or lung disease which would account for [Plaintiff's] alleged SOB" and that the recommendation from the February 5 visit remained "unchanged." Tr. 456.

David W. Bailey, Psy.D., conducted a psychiatric review of Plaintiff on March 9, 2001, and reported that Plaintiff had affective disorders and substance addiction disorders; that Plaintiff may have pathological dependence, passivity, or aggressivity problems; that she has personality disorders in addition to affective disorders; that she has a mild degree of limitation for activities of daily living,

mild difficulty in maintaining social functioning, moderate difficulty in maintaining concentration, persistence or pace, and no repeated episodes of decompensation of extended duration; and that Plaintiff appeared to experience periodic depression and periodically used alcohol which would represent moderate limitations in "CPP over time," "but dep. seems 2nd to physical and situational concerns." Tr. 469-70.

Dr. Bailey conducted a Mental Residual Functional Capacity ("RFC") Assessment on March 9, 2001, pursuant to which he reported that Plaintiff was moderately limited in the following areas: the ability to maintain attention and concentration for extended periods, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, the ability to perform at a consistent pace without an unreasonable number and length of rest periods, and the ability to maintain socially appropriate behavior. Dr. Bailey also reported that Plaintiff was not significantly limited in any other area of review. Tr. 471-72.

On March 14, 2001, Maura Schons, Sr. Counselor, conducted a Physical RFC Assessment of Plaintiff, in which RFC Assessment Ms. Schons reported that Plaintiff's primary diagnosis is coronary spasm with a secondary diagnosis of hypertension; that Plaintiff is capable of occasionally lifting 20 pounds and frequently lifting 10 pounds; that she can stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; that she can sit (with normal breaks) about 6 hours in an 8-hour workday; that her ability to push or pull is otherwise unlimited; that Plaintiff is occasionally limited in climbing, balancing, stooping, kneeling, crouching, and crawling; that this is all secondary to coronary spasm; that Plaintiff has no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations; that Plaintiff's allegations of heart problems and high blood pressure are "credible"; that the restrictions she claims to have on her

"ADLs" are consistent with the restrictions found in the Assessment; and that the shortness of breath that Plaintiff complains of is not supported. Tr. 475-80.

Dr. Serota's records reflect that he saw Plaintiff on August 1, 2001, on which date she complained of visual changes, sleep disturbances, chest pain, "DOE," palpitations, hypertension, abdominal pain, constipation, antacid use and laxative use. Dr. Serota's impression was that Plaintiff's "coronary artery spasm [was] without coronary artery disease at [that] time; that Plaintiff had stent placement in the past; that she had a history of borderline obstructive sleep apnea; and that there was no cardiac reason to terminate her pregnancy. Tr. 505-07.

A report from a sleep study conducted at the Washington University Sleep Disorders Laboratory on October 3, 2001, states that an all-night polysomnogram provided evidence of mild obstructive sleep apnea syndrome accompanied by mild to moderate fragmentation of sleep; that C-PAP treatment was effective for Plaintiff's sleep apnea syndrome; and that at the best pressure there were only an "insignificant number of abnormal breathing events." Tr. 488.

Records from the Cardiovascular Division of the Washington University School of Medicine reflect that Plaintiff saw Andrew Kates, M.D., a cardiologist, on November 19, 2001. Dr. Kates's notes of this date state that Plaintiff was seven months pregnant; that her cardiovascular condition was stable despite the fact that Plaintiff noted several episodes of chest discomfort over the weekend while performing strenuous activity; that Plaintiff's blood pressure was 118/68, her heart rate was 72 with a regular rate and rhythm, her lungs were clear and there was no edema in her extremities; and that Plaintiff had undergone a maximal stress test in August 2001 which was negative for ischemia. Tr. 495.

Dr. Kates's notes reflect that he saw Plaintiff on January 14, 2002; that she was doing well from a cardiac standpoint; that she had no further episodes of chest pain or palpitations; that at the

time of this visit, Plaintiff was 8 months pregnant, her blood pressure was 120/80, her pulse was 82 with a regular rate and rhythm, her extremities were without edema; and that she Plaintiff had a II/VI holosystolic murmur. Dr. Kates' impression on this date was that Plaintiff was stable; that she did have coronary artery disease; that she had been adequately revascularized; and that she had a stress echocardiogram during the pregnancy which showed no signs of ischemia. Dr. Kates noted that there was "no reason to think that [Plaintiff would] not do well with her pending delivery." Tr. 494.

Records from Barnes Jewish Hospital reflect that Dr. Kates saw Plaintiff on February 18, 2002, after Plaintiff had been admitted to the hospital in labor. The impression on this date was that Plaintiff had a history of coronary artery disease which could put her at a slightly increased risk for peripartum cardiac event and that the risk was relatively low. Tr. 492-93.

Dr. Kates's records reflect that he saw Plaintiff on June 3, 2002, for a follow-up appointment concerning her coronary artery disease. Dr. Kates reported on this date that Plaintiff had recently given birth to a healthy baby girl; that Plaintiff had been experiencing intermittent chest discomfort and had been hypertensive since the birth of her child; and that Plaintiff's blood pressure was 160/110 and her heart rate was 80, with a regular rate and rhythm. Dr. Kate's impression was that Plaintiff had known coronary artery disease with vasospasm and had begun to have recurrent and worsening anginal symptoms; that she had poor exercise tolerance during the exercise stress test echocardiogram which was performed during her pregnancy; that it was unclear whether these symptoms were anginal in nature; and that Plaintiff was going to be scheduled for a thallium study to determine the nature of her symptoms. Tr. 490.

An echocardiogram report dated June 23, 2003, reflects findings of mild left ventricular hypertrophy, left atrial enlargement at 4.3 cm, thickened mitral valve, mitral annular calcification is noted, thickened aortic valve, trace-to-mild mitral regurgitation, mild-to-moderate aortic

insufficiency, trace tricuspid regurgitation, and trace pulmonary insufficiency with a pulmonary artery pressure of 15mmHg. Tr. 516.

Plaintiff had a LipoProfile on July 1, 2003, for the purpose of determining her coronary artery disease risk factors. Based on this test, Dr. Serota reported that Plaintiff had an optimal LDL particle number; that her LDL size was in the "lower-risk" category; that she had an intermediate risk factor for large HDL (cholesterol); that she had an intermediate risk level for Large VLDL (triglyceride); that, of the categories of NCEP risk, Plaintiff's total cholesterol was in the "desirable" category; that her LDL cholesterol was in the "optimal" category; that her HDL cholesterol was in the "intermediate" category; and that her triglycerides were at normal levels. Tr. 539-40.

In a letter dated January 19, 2004, addressed to "Whom It May Concern," Dr. Serota stated that Plaintiff had been his patient for four years; that she had a history of coronary artery disease; that she had difficult to control hypertension and continued chest pain; that her cardiac condition had not improved; and that he felt "she should be continued on disability." Tr. 508.

Records from the office of Rolando Larice, M.D., reflect that Plaintiff was seen by Dr. Larice for psychiatric treatment commencing March 30, 2004, and continuing through April 4, 2005. Dr. Larice reported on March 30, 2004, that Plaintiff was anxious, depressed, frustrated, angry and tired; that her thought process and speech were "WNL"; that she denied both suicidal ideation and assaultive/homicidal ideation; and that she was in stable condition with a "good" prognosis. Dr. Larice reported on July 27, 2004, that Plaintiff was anxious and depressed; that her thought process was "WNL"; and that she had "risk issues." On subsequent visits Dr. Larice reported that Plaintiff's affect was euthymic; that her thought process and speech were "WNL"; that she denied both suicidal

and assaultive/homicidal ideation; that her condition was stable; and that her prognosis was "fair."[2] Tr. 558-60.

In a letter dated April 28, 2004, addressed "To Whom It May Concern," Dr. Serota repeated what he had said in his January 2004 letter, including that Plaintiff "should be continued on disability." Tr. 509.

Dr. Serota's records reflect that he saw Plaintiff on August 12, 2004. The impression from this visit was that she had severe hypertension "despite multiple medications"; that she had three negative cardiac catheterizations since her stent in 2000; that she was due for an echocardiogram and carotid ultrasound; and that she had a previous history of alcohol and tobacco use, a history of coronary spasm, normal LV function, low HDL, obesity, and a history of DVT. Dr. Serota noted that he was going to get a renal artery ultrasound and directed Plaintiff to see Dr. Donovan Polack for a second opinion regarding her hypertension. Tr. 510-512.

Records from the Metro Hypertension and Kidney Center reflect that Dr. Polack saw Plaintiff on August 23, 2004. Dr. Polack's notes of this date reflect that Plaintiff was within normal levels for all indicators related to neck, respiratory, cardiovascular, chest, gastrointestinal (with the exception that it was noted that she was "obese" in the section on abdomen condition), musculoskeletal, skin, and psychiatric function. Records further reflect that Plaintiff was assessed as having hypertension, sleep apnea, coronary artery disease, high cholesterol and "M.O.," and that she was told to use a C-PAP machine every night, to stop smoking, to lose weight and to exercise. Tr. 543-44.

Dr. Serota's notes reflect that he saw Plaintiff on September 27, 2004, and that on this date Plaintiff's hypertension had improved; that her blood pressure was 137/92 and 135/94; that her chest

_____

[2] One date of Dr. Larice's clinical record note is not legible and another note does not include a date.

pain "seem[ed] to be doing better"; that her Cardiolite and echo were benign; that she had a negative renal artery ultrasound and a negative echo except for LVH; that she had moderate aortic insufficiency; that she had normal LV function; that she had a history of coronary spasms; that she had low HDL; that she had a history of DVT and negative VQ scan; and that she had high cholesterol which was under treatment. Tr. 513-15.

The records from the Metro Hypertension and Kidney Center reflect that Plaintiff was seen on September 27, 2004, at which time Dr. Polack reported that Plaintiff had hypertension, sleep apnea, coronary artery disease, high cholesterol, "M.O.," and an ovarian cyst. Records of this date further state that Plaintiff weighed 259 pounds; that her blood pressure was 140/100 in her right arm and 148/84 in her left arm; that Plaintiff appeared comfortable, with no respiratory distress, no jaundice, and no periorbital edema; that her jugular vein was not visible; that she had carotid bruit on both sides; that her mucous membranes were dry; that she had no oral ulcers or plaques; that she had a nonlabored respiratory effort that was clear to auscultation and percussion, with absent basiliar rales; that in regard to her cardiac condition, Plaintiff had S1 normal, S2 normal, and no murmurs were audible; that Plaintiff had a normal abdomen, no bladder distension, nonpalpable distal pulses in her extremities, no sacral edema, rashes, or cyanosis; that she had normal motor and sensory function; and that she was cooperative psychiatric affect. Tr. 542.

Dr. Serota stated in a letter dated November 8, 2004, and addressed to "To Whom It May Concern," that Plaintiff had been a patient of his for four years and that she has a history of coronary artery disease status-post stenting with difficult to control hypertension, coronary spasms, and continued chest pain. Dr. Serota further stated that he felt that Plaintiff should be continued on disability since her cardiac condition had not improved. Tr. 500.

Dr. Larice's records of April 4, 2005, state that on this date Plaintiff's affect was euthymic and anxious; that her thought process and speech were "WNL"; that she denied suicidal ideation; that she did not express any assaultive/homicidal ideation; that she was stable; and that her prognosis was "guarded." Tr. 561.

Dr. Serota's notes of April 21, 2005 reflect that Plaintiff's hypertension was difficult to control; that she complained of fatigue, chest pain, and DOE; that Plaintiff was to discontinue Hydrochlorothiazide treatment for hypertension and start taking Lasix and Potassium treatments; that Plaintiff had a negative renal artery workup; that she had a history of negative DVT and negative VQ scans; that she was intolerant of high doses of Niaspan; that she has a history of coronary artery spasm; that she had good LV function; that she had a history of moderate aortic insufficiency; that she had negative carotid ultrasounds; that she had sleep apnea and benign Cardiolite; and that she needed electrolytes. Tr. 553-55.

Dr. Polack's records of May 4, 2005, state that Plaintiff was not experiencing any fevers, chills, PND, orthopnea, or dyspnea; that she has no orthostatic symptoms, lightheadedness, dizziness, no cough, sputum production, nausea, vomiting or diarrhea; that her intake was good; that her blood pressure was 180/118; that her heart rate was 96; and that Plaintiff had not taken her blood pressure medication. Notes of this date further state that Plaintiff appeared comfortable, with no respiratory distress, jaundice, or periorbital edema; that her jugular vein was not visible; that she had no carotid bruit; that her mucous membranes were dry; that she had no oral ulcers or plaques; that she had a nonlabored respiratory effort that was clear to auscultation and percussion, with absent basiliar rales; that, in regard to her cardiac condition, Plaintiff's PMI was not displaced, with S1 normal, S2 normal, and no murmurs audible; that she had a normal abdomen, an enlarged liver, no bladder distension, nonpalpable distal pulses in extremities, and no sacral edema, rashes, or cyanosis; that she had normal

motor and sensory function; that she had a cooperative psychiatric affect; and that the assessment was that Plaintiff had hypertension with poor compliance, obstructive sleep apnea, coronary artery disease, high cholesterol, morbid obesity and an ovarian cyst. Tr. 541.

A Cardiac RFC Questionnaire completed by Dr. Serota sometime after May 5, 2005, reflects that Dr. Serota had been treating Plaintiff for five years. On the questionnaire, Dr. Serota reported that Plaintiff had hypertension, coronary artery disease, aortic insufficiency and sleep apnea, and had a poor prognosis. Dr. Serota further reported in the questionnaire, that Plaintiff's blood pressure was 184/124; that her symptoms included chest pain, shortness of breath, fatigue, weakness, edema, nausea, palpitations, dizziness, and sweatiness; that Plaintiff had "marked limitation of physical activity," demonstrated by fatigue, palpitation, dyspnea or anginal discomfort; that she was incapable of even "low stress" jobs; that Plaintiff's physical symptoms and limitations caused emotional difficulties; that Plaintiff's emotional difficulties did not contribute to Plaintiff's subjective symptoms and functional limitations; that Plaintiff's cardiac symptoms were frequently severe enough to interfere with attention and concentration needed to perform even simple work tasks; that Plaintiff's impairments (both physical and emotional) were "reasonably consistent" with the symptoms and functional limitations described in the evaluation; that the impairments had lasted and/or could be expected to last at least twelve months; that Plaintiff could walk zero city blocks without rest or severe pain; that Plaintiff could stand or walk less than 2 hours of an 8 hour workday; that she did not need a job that permits shifting positions at will from sitting, standing or walking; that she will sometimes need to take unscheduled breaks on an hourly basis during an 8-hour working day, in which cases she may have to lie down or sit quietly; and that she would not have to have her legs elevated with prolonged sitting; that Plaintiff should never lift or carry any amount of weight; that she could never twist, stoop (bend), crouch/squat, climb ladders, or climb stairs; that she should never

be exposed to extreme temperatures, high humidity, wetness, cigarette smoke, perfumes, soldering fluxes, solvents/cleaners, fumes, odors, gases, dust, or chemicals; that, on average, Plaintiff would likely be absent from work more than four days per month; and that Plaintiff's symptoms and limitations had been ongoing for years. Tr. 548-52.

Dr. Serota reported on May 16, 2005, that Plaintiff was seen on this date and that she had difficulty controlling her hypertension; that Plaintiff had "angioplasty in the past, but a follow up cath ha[d] been negative"; that Plaintiff had coronary artery disease with persistent chest pain, sleep apnea which was under treatment, moderate aortic insufficiency, good LV function, history of coronary artery spasm, history of intolerance to higher doses of Niaspan, and a history of negative DVT, venous dopplers, negative VQ scans, and negative renal artery ultrasound; that he thought Plaintiff was "totally disabled from her high blood pressure"; that Plaintiff had no complaint of fatigue or weakness; that Plaintiff had no complaints of headaches, abnormal sensation, dizziness, incoordination, unsteady gait, decreasing mentation, or tremor; that Plaintiff had no complaints of joint pain, stiffness, back pain, swelling, limitation of range of motion, or muscle weakness; that Plaintiff had no complaints of depression, sleep disturbances, or anxiety; that Plaintiff had "no complaint of chest pain, DOE, PND, orthopnea, palpitations, varicose veins, edema, hypertension, claudication, cyanosis, murmurs, thrombophlebits"; that Plaintiff was well developed nutritionally and in no apparent distress; that Plaintiff was well groomed with normal body habitus; that Plaintiff was alert and oriented to time, place and person; that Plaintiff's mood and affect were normal; and that he was going to repeat an aortogram along as well as a cardiac catheterization and echocardiogram. Tr. 580.

Dr. Serota's records state that Plaintiff was seen on October 11, 2005. Dr. Serota noted on this date that Plaintiff had difficult-to-control hypertension, negative renal angiograms, normal

creatinine, high cholesterol, coronary artery plaquing, good LV function, mild aortic insufficiency, sleep apnea for which she was not using the C-PAP because it was not covered by her insurance, history of coronary artery spasm, and a history of deep venous thrombosis, venous dopplers and negative VQ scans; that Plaintiff was in no apparent distress; that Plaintiff's May 2005 cardiac catheterization showed no renal artery stenosis and moderate plaquing; that Plaintiff's ejection fraction was normal; that Plaintiff had a .1+ aortic insufficiency; that Plaintiff "still [had] intermittent chest pains"; that Plaintiff's gait was normal; that Plaintiff's muscle strength "appear[ed] normal without evidence of atrophy or abnormal movements"; that an EKG showed normal sinus rhythm, nonspecific ST and T-wave abnormalities; that in regard to Plaintiff's cardiac exam, she had a regular rate and rhythm, normal S1 and S2, normal size, location and forcefulness of PMI, no thrills, lifts, murmurs, rubs or gallops; that Plaintiff was well groomed with normal body habitus; that Plaintiff's medications included aspirin, Niaspan, fish oil, Trazodone, Seroquel, Lisinopril, Benicar, Cartia, HCTZ, Bupropion, and Vytorin; that Plaintiff had no complaints of fatigue or weakness; that Plaintiff had no complaints of headaches, abnormal sensation, dizziness, incoordination, unsteady gait, or decreasing mentation; that Plaintiff had no complaints of joint pain, limitation of range of movement or muscle weakness; that Plaintiff had no complaint of depression, sleep disturbances, anxiety, delusions, hallucinations, or suicidal ideation; that Plaintiff had "no complaint of chest pain, DOE, PND, orthopnea, palpitations, vaircose veins, edema, hypertension, claudication, cyanosis, murmurs, thrombophlebitis"; that Plaintiff's blood pressure was 184/114 and 169/116; that her pulse was 96 and regular; that her weight was 225 pounds; that Plaintiff was alert and oriented to time, place, and person; and that Plaintiff would be a good candidate for "ECP." Tr. 575-77.

## IV.
## DECISIONS OF THE ALJ

### A.    October 2002 ALJ's Decision

In his decision of October 24, 2002, the ALJ found that Plaintiff had a status-post mild Q-wave myocardial infarction (heart attack), a history of coronary artery disease of the left anterior descending and circumflex arteries with coronary artery vasospasm; a stent placement for coronary artery disease in September 2000; hypertension, hyperlipidemia, peptic ulcer disease, left leg deep vein thrombosis and a large hiatal hernia all controlled by medication; obstructive sleep apnea; and brief situational depression. The ALJ found, however, that Plaintiff had no impairment or combination of impairments that met or equaled in severity the requirements of any impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found that Plaintiff's allegation that her impairments were sufficient to prevent performance of any sustained work activity were not credible and that there were no credible, medically established mental or other nonexertional limitations, leading to the decision that Plaintiff had the RFC to perform the physical exertional and nonexertional requirements of work except for lifting or carrying more than 10 pounds frequently or more than 20 pounds occasionally. In reaching his conclusion, the ALJ reviewed and summarized the medical evidence on the record including the records of Dr. Serota, Dr. Kates, and Dr. Polack, as well as the testimony of Plaintiff and a VE. He did not determine whether Plaintiff had engaged in substantial gainful activity ("SGA") due to a lack of definitive evidence of Plaintiff's employment status at the time of the decision. The ALJ stated that if the case were to be remanded he would revisit and analyze the issue of SGA in greater depth.

The ALJ concluded from the medical evidence that Plaintiff's heart condition was stable after mild damage from the myocardial infarction, with the exception of the brief recurrence of chest pain which necessitated stent placement and angioplasty. The ALJ further considered that any chest pain after the stent placement was noted to be atypical; that there was not much documentation of frequent chest pain or arrhythmias; that all other conditions were controlled by medication; that Plaintiff's

sleep apnea was no worse than mild; that Plaintiff had no leg edema after her pregnancy; and that there was no evidence of respiratory disease. The ALJ considered that Plaintiff had no surgery or inpatient hospitalization since her stent placement in September 2000; that she had not been referred for physical therapy or to a pain clinic; that there was no documented record or allegation of adverse side effects of medication (with whatever side effects which had occurred over the years being controlled by changes in medication type or dosage); and that the medical evidence established no inability to ambulate effectively or make fine or gross movements based on musculoskeletal impairment. The ALJ found that restrictions in her daily activities which Plaintiff experienced were those that she imposed on herself and that Plaintiff did not suffer from nonexertional pain which seriously interfered with her ability to concentrate.

Further, the ALJ considered that Plaintiff had normal or better intelligence and that her documented history of depression was caused by outside stressors in her life, leading him to the conclusion that Plaintiff's abilities to think, understand, communicate, concentrate, get along with other people, and handle normal work stress had never been significantly impaired on a long-term basis. He further noted that Plaintiff displayed no obvious signs of depression, anxiety, memory loss, or other mental disturbance when she testified at the hearing.

The ALJ considered that there was no medical evidence of any chronic, severe mental impairment, and that the only mental difficulty documented spanned less than three months, from January 27 to March 1, 2000. Assuming, arguendo, that Plaintiff did suffer from chronic depression which limited her to performing simple, repetitive tasks, the ALJ noted that a VE testified that there were still 27,100 light exertion non-skilled jobs in the state of Missouri, as well as 4200 sedentary jobs that Plaintiff could perform given her physical limitations, and that these numbers would only decrease by 50% if Plaintiff had to avoid exposure to extreme temperatures and atmospheric irritants,

still leaving a significant number of jobs Plaintiff could perform.  Because he discredited Plaintiff's allegation of frequent unbearable pain and the necessity of taking frequent breaks during a workday, the ALJ did not consider a hypothetical posed to the VE which included these alleged limitations.

The ALJ found that there was no evidence that Plaintiff had any marked, extreme, or moderate inability to perform the functions of daily living independently, appropriately, effectively, and on a sustained basis and concluded that Plaintiff produced no credible evidence of a mental impairment or combination of mental impairments that qualified her as disabled.  The ALJ further concluded that Plaintiff's allegations of physical impairments which rendered her disabled were also not credible as they were not supported by the medical evidence and that any restrictions Plaintiff did face were self-imposed.  The ALJ concluded that Plaintiff was not disabled because there were numerous jobs in the economy she could perform given every credible limitation or impairment presented to the VE. Tr. 40-47.

**B.      July 2005 ALJ's Decision:**

In his July 2005 decision regarding Plaintiff the ALJ stated that the summaries of the hearing testimony and the medical records from the October 2002 decision were incorporated by reference, "except to the extent that the analysis may be invalid, incomplete, or otherwise inconsistent with the analysis in [the second] decision." Tr. 21.  The ALJ's decision of July 22, 2005 addressed additional medical evidence presented after the first decision and testimony from the supplemental hearing held on May 24, 2005.

In determining whether Plaintiff performed any substantial gainful activity after her alleged onset date, the ALJ considered the fact that Plaintiff did work after March 1, 1999, as an administrative assistant and that she worked in this capacity from April to June 2000, again in August 2001, and again in January 2002.  The ALJ found that at no time did this work qualify as SGA

because it never met the necessary duration or average monthly earnings requirements under the earnings guidelines of 20 C.F.R. § § 404.1574 and 416.974. The ALJ also considered that even though Plaintiff had slight earnings in 2003 and 2004, these earnings did not meet the requirements to qualify as SGA.

After finding that she had not engaged in SGA since her alleged onset date, the ALJ considered whether Plaintiff's obesity qualified as a disability. Noting that while Plaintiff is obese, her weight never quite met or exceeded the 266 pounds which would qualify a woman of her height (5 feet, 5 inches) for disability due to obesity under Section 9.09 of Appendix 1, Subpart P, Regulations No. 4, which was in effect until October 25, 1999. Furthermore, the ALJ noted that, under Social Security Ruling 02-01p, obesity is no longer considered an impairment that can qualify as a disability on its own, and he determined that Plaintiff never suffered from any impairment which, when combined with her obesity, would qualify her as disabled. The ALJ also considered the fact that neither Dr. Serota nor Dr. Polack found any reason to terminate Plaintiff's pregnancy based on her physical limitations. The ALJ noted that although Plaintiff's blood pressure had been elevated, it came back down after she started using a C-PAP machine for her sleep apnea. The ALJ also noted that Plaintiff had no major chest pain as of September 27, 2004, and that Dr. Serota's notes reflected three negative cardiac catheterizations after her stent placement. The ALJ also noted positive EKG results in August 2004, carotid arterial duplex study results that reflected no significant degree of stenosis and only mild mixed plaque formation in the carotid arteries, and a renal study which showed no renal arterial stenosis. Tr. 24.

The ALJ discredited Dr. Serota's "to whom it may concern" opinions and the RFC Assessment in which he declared that he felt Plaintiff was not employable due to her combination of impairments. Upon discrediting Dr. Serota's opinion the ALJ noted that Dr. Serota's conclusion was

inconsistent with his own clinical records which reflect a history of coronary artery spasm but no debilitating coronary artery disease; that Dr. Serota's conclusion was inconsistent with Dr. Polack's assessment which determined that almost all of Plaintiff's chronic physical impairments were stable and that her uncontrolled hypertension was due to medication noncompliance; that Dr. Serota's opinion was inconsistent with the opinion of the medical expert, Dr. Alex; and that Dr. Serota's conclusion was inconsistent with Plaintiff's own testimony that she required no cane, crutch, or other device to walk.

The ALJ found that the medical evidence established that Plaintiff has obesity; a status-post mild Q-wave myocardial infarction (heart attack); a history or coronary artery disease of the left anterior descending and circumflex arteries with coronary artery vasospasm; a stent placement for coronary artery disease in September 2000; hypertension, hyperlipidemia, peptic ulcer disease, left leg deep vein thrombosis and a large hiatal hernia all controlled by medication; and obstructive sleep apnea and mild depression, "but no impairment or combination of impairments that meets or equals in severity the requirements of any impairment listed in Appendix 1, Subpart P, Regulations No. 4." The ALJ found that Plaintiff's allegation of impairments, either singly or in combination, produced symptoms and limitations of sufficient severity to prevent the performance of any sustained work activity was not credible.

Regarding Plaintiff's mental condition, the ALJ referred back to his earlier decision in which he determined that Plaintiff's brief documented history of mental health treatment was in response to situational stressors only, and that there were jobs in the Missouri economy which Plaintiff could perform even if she did have a mental capacity for no more than simple repetitive tasks. The ALJ stated in the July 2005 decision that he was "unable to account for the State Agency medical evaluator's [Dr. Bailey] opinion from March 2001 imposing additional mental limitations" and that

he could "only assume that the evaluator was overlooking the duration requirement of the Act." Regarding Dr. Larice's records, the ALJ noted that the records were largely illegible, but what was readable reflected that Plaintiff complained of anxiety and/or depression occasionally between April 2004 and April 2005, but that there was no evidence of suicidal ideation, psychosis, or any profound or uncontrollable thought disorder, and that her mood was pretty stable with medication.

Based on the testimony of the medical expert, Dr. Alex, the ALJ found that Plaintiff has the RFC to perform the physical exertional and nonexertional requirements of work except for lifting or carrying more than 10 pounds frequently or more than 20 pounds occasionally; climbing ropes, ladders or scaffolds and more than occasional climbing of ramps and stairs; working at unprotected heights or around dangerous moving machinery; and concentrated or excessive exposure to dust, allergies, pollutants, and atmospheric irritants. The ALJ found that Plaintiff had no credible, medically-established mental or other nonexertional limitations.

The ALJ considered the VE's testimony that there were specific jobs available in significant numbers which are jobs are consistent with Plaintiff's RFC. Based on Plaintiff's RFC, the fact that she was defined as a younger individual at 42 years old, the fact that she is a high school graduate with some college credits, the fact that she has acquired managerial and administrative work skills, which can be applied to the semi-skilled functions of other work, and the fact that she has an exertional functional capacity for light work, the ALJ found that 20 C.F.R. § § 404.1569 and 416.969 and Rule 202.22, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 directed a conclusion that Plaintiff is "not disabled." The ALJ noted that the rules would produce the same result even if Plaintiff was restricted to unskilled sedentary work. Tr. 19-29.

## V.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529.[3] "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)). Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. §§ 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Afpel, 221 F.3d 1065, 1069 n.5 (8th Cir.

---

[3]    See  Willcockson v. Astrue, No. 07-3757, Slip Op. at 2 (8th Cir. Aug. 28, 2008) (holding that the Regulations governing disability income and SSI claims are identical in all relevant respects).

2000). The ALJ will review a claimant's residual functional capacity and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. §§ 404.1520(f). Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. §§416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug.26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

An administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted). See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ.& Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating Plaintiff's credibility. Id. The ALJ must also consider Plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as Plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject Plaintiff's complaints. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the

record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b-e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983). Second, once Plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with Plaintiff's qualifications and capabilities. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. Goff, 421 F.3d at 794("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862

F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits Plaintiff's subjective complaints of pain for legally sufficient reasons. Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell, 892 F.2d at 750.

## VI.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992). Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm his decision as long as there is substantial evidence in favor of the Commissioner's position. Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. In particular, Plaintiff contends that the ALJ failed to properly consider the medical record including the opinion of Dr. Serota; that the ALJ failed to consider her obesity; that the ALJ failed to properly consider Plaintiff's RFC under the standards of Singh v. Apfel, 222 F.3d 448 (8th Cir. 2000), and Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001); and that the ALJ posed a flawed hypothetical question to the VE.

### A.    The ALJ's Consideration of Plaintiff's Medical Records and Dr. Serota's Opinion:

Plaintiff contends that the decision of the ALJ is legally insufficient because he did not properly evaluate the medical opinion evidence pursuant to the factors identified in 20 C.F.R. §404.1527 and that he did not give proper weight to the opinion of Dr. Serota, who was her treating doctor.

20 C.F.R. §404.1527(d) provides that the following factors are relevant to weighing the medical evidence: examining relationship, treatment relationship, length of treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability, consistency,

specialization, and other factors which might be relevant such as "the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion."

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted). The opinions and findings of the plaintiff's treating physician are entitled to "controlling weight" if that opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2) (2000)). Indeed, if they are not controverted by substantial medical or other evidence, they are binding. Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir.1991); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998)). However, while the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data. Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8thCir.1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data). See also Hacker v. Barnhart, 459 F.3d 934, 9937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician's opinion is giving controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial

evidence"). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). A treating physician's checkmarks on a form, however, are conclusory opinions which can be discounted if contradicted by other objective medical evidence. Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004); Hogan 239 F.3d at 961; Social Security Ruling 96-2p, (July 2, 1996). Where diagnoses of treating doctors are not supported by medically acceptable clinical and laboratory diagnostic techniques, the court need not accord such diagnoses great weight. Veal v. Bowen, 833 F.2d 693, 699 (7th Cir. 1987). An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch, 201 F.3d at 1013. See also Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (holding that an ALJ may give a treating doctor's opinion limited weight if it is inconsistent with the record). "Medical reports of a treating physician are ordinarily entitled to greater weight than the opinion of a consulting physician." Chamberlin, 47 F.3d at 1494 (citing Matthews, 879 F.2d at 424).

A treating physician's opinion that a claimant is not able to return to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). Moreover, a brief, conclusory letter from a treating physician stating that the applicant is disabled is not binding on the Secretary. Ward v. Heckler, 786 F.2d 844, 846 (8th Cir.1986) (per curiam) ("Even statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature."). See also Hacker v. Barnhart,

459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight should not be given to the RFC assessment); Chamberlain, 47 F.3d at 1494; Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir.1994) (citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir.1991)); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as its not being supported by any detailed, clinical, diagnostic evidence). On the other hand, a treating physician's observations should not necessarily be treated as conclusory where the doctor had "numerous examinations and hospital visits" with a claimant. See Turpin v. Bowen, 813 F.2d 165, 171 (8th Cir.1987).

Additionally, Social Security Regulation ("SSR") 96-2p states, in its "Explanation of Terms," that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." 1996 WL 374188, *2 (S.S.A. July 2, 1996). Additionally, SSR 96-2p clarifies that 20 C.F.R. § § 404.1527 and 416.927 require that the ALJ provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)." Id. at *5.

The Eighth Circuit holds that "if a treating physician ... has not issued an opinion which can be adequately related to the [Social Security Act's] disability standard, the ALJ is obligated ... to address a precise inquiry to the physician so as to clarify the record." Vaughn v. Heckler, 741 F.2d 177, 179 (8th Cir. 1984) (quoting Lewis v. Schweiker, 720 F.2d 487, 489 (8th Cir.1983)).

When considering the weight to be given the opinion of a treating doctor, the entire record must be evaluated as a whole. Wilson v. Apfel, 172 F.3d 539, 542 (8th Cir. 1999) (quoting Cruze v.

Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996) ("Although a treating physician's opinion is generally entitled to substantial weight, such opinion does not automatically control, since the record must be evaluated as a whole."). "'It is the ALJ's function to resolve conflicts among the various treating and examining physicians.'" Tindell v. Barnhart, 444 F.3d 1002, 1004 (8th Cir.2006) (quoting Vandenboom v. Barnhart, 421 F.3d 745, 749-50 (8th Cir. 2005) (internal marks omitted). While a treating doctor's opinion is not controlling, "it may assist an ALJ [in] determining whether a claimant is disabled." Samons v. Astrue, slip op. 06-2289 (Aug. 13, 2007) (citing Bergmann v. Apfel, 207 F.3d 1065, 1070-71 (8th Cir. 2000)).

First, to the extent that the ALJ did not consider every factor identified in § 404.1527(d), this failure does not suggest that these factors were not considered. See Wheeler v. Apfel, 224 F.3d 891, 896 n.3 (8th Cir. 2000) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (holding that an ALJ is not required to discuss every piece of evidence submitted and that an "ALJ's failure to cite specific evidence does not indicate that such evidence was not considered"). To the extent that ALJ may not have mentioned every medical record, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. See Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 n.3 (8th Cir. 2005) ("The fact that the ALJ's decision does not specifically mention the [particular listing] does not affect our review."); Wheeler, 224 F.3d at 896 n.3; Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995).

Second, as stated above, in both opinions the ALJ elaborated regarding the medical evidence. In the second decision, the ALJ's incorporated medical evidence that was submitted for consideration in his first decision and which he addressed in his first opinion. Further, the ALJ considered medical records submitted subsequent to his first decision. In particular, consistent with § 404.1527(d), the ALJ considered the relationship of the reporting doctors to Plaintiff, their specialties, the length of

time during which they treated Plaintiff, their medical records, their opinions, and Plaintiff's test results. Significantly, the ALJ considered that Dr. Serota was Plaintiff's most consistent treating physician; that Dr. Polack is a hypertension specialist who saw Plaintiff on numerous occasions; that Dr. Kates is a cardiologist who treated Plaintiff during her pregnancy; and that Dr. Alex was a consulting doctor who evaluated Plaintiff.

Third, consistent with 20 C.F.R. 404.1527(d)(1), the ALJ considered that the opinion of a treating physician, such as Dr. Serota, is normally be entitled to more weight than the opinion of a doctor that never examined Plaintiff. See Singh, 222 F.3d at 452 (holding that the opinion of a primary treating physician is normally be entitled to controlling weight, "provided the opinion is *well-supported* by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record") (emphasis added). Consistent with the case law and Regulations, only after reviewing Dr. Serota's clinical notes, laboratory and diagnostic results and reports, and the records of other doctors, did the ALJ conclude that Dr. Serota's opinion that Plaintiff is disabled and incapable of SGA is inconsistent with Dr. Serota's own records as well as other doctors' records, Plaintiff's medical history, the opinion of Dr. Alex who reviewed Plaintiff's medical records, and Plaintiff's own testimony. 20 C.F.R. § 404.1527(d)(2). The court has set forth above, in detail, factors considered by the ALJ in discrediting Dr. Serota's opinion that Plaintiff is disabled and cannot engage in SGA. Further, upon assessing the supportability and the consistency of Dr. Serota's opinion, the ALJ considered the fact that neither Dr. Serota nor Dr. Kates felt there was any reason that Plaintiff could not have a normal delivery of her baby in 2002 due to her cardiac condition. The ALJ further noted that in June 2003, Plaintiff underwent an echocardiogram which showed minimal left ventricular hypertrophy, mild to moderate aortic insufficiency, and trace tricuspid regurgitation. The ALJ considered the fact that Plaintiff had no major chest pain complaints as of

September 27, 2004, and that she had three negative cardiac catheterizations since her stent placement in September 2000. The ALJ also considered Dr. Polack's records, which reflect that, as of May 2004, Plaintiff had high blood pressure due to poor medication compliance, but that her sleep apnea, hyperlipidemia and coronary artery disease were all stable. The ALJ noted that Plaintiff's blood pressure was notably elevated in August 2004, but that once Plaintiff began using the C-PAP machine for her sleep apnea, her blood pressure came down in September 2004.

The court notes that despite Dr. Serota's opining that Plaintiff cannot work due to her hypertension, chest pain, and coronary artery disease and despite his stating in an RFC Assessment that Plaintiff had limitations with standing and walking, that she could not lift any amount of weight, and that she can never twist, stoop, or bending, Dr. Serota's own August and September 2004 treatment notes state that Plaintiff had "no complaint of chest pain, ... hypertension," that she had no complaint of depression or sleep disturbances, that her mood was normal, and that she had "no complaint of joint pain, stiffness, ... limitation of range of movement, muscle weakness." Thus, substantial evidence on the record as a whole supports the ALJ's discrediting Dr. Serota's opinion that Plaintiff is disabled and incapable of SGA. See Stormo, 377 F.3d at 805-06; Hogan 239 F.3d at 961; Social Security Ruling 96-2p. Further, substantial evidence on the record as a whole supports the ALJ's finding that Dr. Serota's conclusions should not be afforded controlling weight because they are not supported by medically acceptable clinical and laboratory diagnostic techniques. See Cox, 471 F.3d at 907; Veal, 833 F.2d at 699; Prosch, 201 F.3d at 1013.

Fifth, while Dr. Serota reported that Plaintiff's blood pressure was hard to control, as stated above, Dr. Polack reported that Plaintiff was non-compliant with her medication. A lack of desire to improve one's ailments by failing to follow suggested medical advice detracts from a claimant's credibility. See Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989) (holding that the ALJ can

discredit subjective complaints of pain based on claimant's failure to follow prescribed course of treatment); Weber v. Harris, 640 F.2d 176, 178 (8th Cir. 1981). Moreover, Dr. Serota reported in September 2004 that Plaintiff's hypertension had improved with C-PAP; March and April 1999 records state that Plaintiff's blood pressure was stabilized when she was on medication; and June 1999 records state that her hypertension was well controlled. Conditions which can be controlled by treatment are not disabling. Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James, 870 F.2d at 450. Additionally, the court notes that Plaintiff's blood pressure was 140/90 in February 1999; that it was 188/88 in July 2000; and that it was 117/65 in August 2000. See Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992) (holding that a high blood pressure reading of 170/90 indicates only moderate hypertension); Brown v. Heckler, 767 F.2d 451, 453 (8th Cir. 1985) (holding that blood pressure which measures within the range of 140-180/90-115 is considered mild or moderate, and that hypertension does not qualify as severe where it does not result in damage to the heart, eye, brain or kidney) (citing 20 C.F.R. Part 404, Subpart P, Appendix 1, 4.00 C).

Sixth, in regard to Dr. Serota's opining that Plaintiff is disabled and that she is unable to engage in SGA, as stated above, such a determination is not afforded controlling weight and is not binding, especially because Dr. Serota's conclusions are inconsistent with his own notes and Plaintiff's medical records. See Hacker, 459 F.3d at 937; Ellis, 392 F.3d at 994; Chamberlain, 47 F.3d at 1494; Barrett, 38 F.3d at 1023; Ward, 786 F.2d at 846; King, 742 F.2d at 973. Indeed, the ALJ identified good reasons for not accepting Dr. Serota's opinion, including that it was not supported by clinical and diagnostic evidence. See Ward, 786 F.2d at 846; King, 742 F.2d at 973.

Seventh, upon discrediting Dr. Serota's opinion that Plaintiff is disabled and unable to engage in SGA, the ALJ considered Plaintiff's testimony about her daily activities. Indeed, at the first hearing, Plaintiff testified that she went to her son's soccer games, relatives' houses, the movies, and church. In the second hearing Plaintiff testified that she drives to the grocery store, is on her church's hospitality committee, goes to the library once a week, and transports her son to his activities. While the undersigned appreciates that a claimant need not be bedridden before she can be determined to be disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with her subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. Eichelberger, 390 F.3d at 590 (holding that the ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001); Onstead, 962 F.2d at 805; Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992); Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987); Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987). Indeed, the Eighth Circuit holds that allegations of disabling "pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001) (citing Benskin, 830 F.2d at 883). "Inconsistencies between [a claimant's] subjective complaints and [his] activities diminish [his] credibility." Goff, 421 F.3d at 792 (citing Riggins v. Apfel, 177 F.3d 689, 692 (8th Cir. 1999)). See also Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001); Nguyen v. Chater, 75 F.3d 429, 439-31 (8th Cir. 1996) (holding that a claimant's daily activities including visiting neighbors, cooking, doing laundry, and attending church were incompatible with disabling pain and affirming denial of benefits at the second step of analysis). The court finds, therefore, that the ALJ properly considered Plaintiff's daily activities upon choosing to discredit her complaints of debilitating pain. The court further finds that substantial evidence supports the ALJ's decision in this regard.

Eighth, the ALJ also considered that Plaintiff worked as an administrative assistant between 2000 and 2001 although this work was performed for only a short duration. Plaintiff alleges that she became disabled in March 1999. Moreover, Plaintiff testified that she stopped work as an administrative assistant after four or five months in that it "got to be too much" as she was eight months pregnant. "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Johnson v. Apfel, 240 F.3d 1145, 1148049 (8th Cir. 2001). "Working generally demonstrates an ability to perform a substantial gainful activity." Goff, 421 F.3d at 792 (citing Nabor v. Shalala, 22 F.3d 186, 188-89 (8th Cir. 1994)). 20 C.F.R. §404.1574(a) provides that if a claimant has worked, the Commissioner should take this into consideration when determining if the claimant is able to engage in substantial gainful activity. Moreover, when a claimant has worked with an impairment, the impairment cannot be considered disabling without a showing that there has been a significant deterioration in that impairment during the relevant period. See Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990). Further, working after the onset of an impairment is evidence of an ability to work. Goff, 421 F.3d at 793; Goswell v. Apfel, 242 F.3d 793, 798 (8th Cir. 2001). Section 404.1574(a)(1) further states that work which a claimant is forced to stop or reduce below the substantial gainful activity level after a short time because of his impairment is generally considered an unsuccessful work attempt.

Ninth, to the extent that the medical opinions in the record are inconsistent, it is not the job of the district court to re-weigh the evidence or review the factual record de novo. See Cox, 495 F.3d at 617; Guilliams, 393 F.3d at 801; McClees, 2 F.3d at 302; Murphy, 953 F.2d at 384. In this case, the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's decision. See Davis, 239 F.3d at 966. In conclusion, for the reasons stated above, as well as below, the court finds that the ALJ's consideration of Dr. Serota's opinion as well as the

medical evidence of record is supported by substantial evidence and that it is consistent with the case

law and the Regulations. See Onstead, 962 F.2d at 804.

**B.      Plaintiff's Obesity:**

Plaintiff contends that the ALJ did not properly consider her obesity because he did not review

it under the standards of Social Security Ruling 02-1p.

First, 20 C.F.R.,Pt. 404, Subpt. P, App. 1, 1.00, Q, states:

Effects of obesity. Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

Social Security Ruling ("SSR") 02-01p, 2000 WL 628049, at *2-5 (Sept. 12, 2002), states,

in relevant part, that:

Obesity is a complex, chronic disease characterized by excessive accumulation of body fat.   Obesity is generally a combination of factors (e.g., genetic, environmental, and behavioral).   . . .

We will consider obesity in determining whether:

The individual has a medically determinable impairment. . . .

The individual's impairment(s) is severe. . . .

The individual's impairment(s) meets or equals the requirements of a listed impairment in the listings. . . .

The individual's impairment(s) prevents him or her from doing past relevant work. . . .

If an individual has the medically determinable impairment obesity that is "severe" as described  [above], we may find that the obesity medically equals a listing.

. . . We may find in a title II claim, or an adult claim under title XVI, that the obesity results in a finding that the individual is disabled based on his or residual functional capacity (RFC), age, education, and past work experience. However, we will also consider the possibility of coexisting or related conditions, especially as the level of obesity increases. . . .

There is no specific weight or BAI that equates with a "severe" or a "not severe" impairment. . . . Rather, we will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe. . . .

Because there is no listing for obesity, we will find that an individual with obesity may meet the requirements of a listing if he or she has another impairment that, by itself, "meets" the requirements of a listing. We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing.

Upon concluding that Plaintiff was not disabled, the ALJ did not dispute Plaintiff's allegation that she was obese. Rather, in the second opinion the ALJ considered all Plaintiff's symptoms and medical records in light of her obesity, and concluded that the combination of her impairments did not meet the requirements of a listing. Further, when determining Plaintiff's RFC, the ALJ considered Plaintiff's obesity in conjunction with other limitations which he found credible. Indeed, Dr. Alex reported that Plaintiff's ability to lift and her ability to climb were limited due to her obesity. The ALJ took these factors into consideration when determining Plaintiff's RFC and concluded that, although she cannot perform the full range of light sedentary jobs, there are jobs available which a person with Plaintiff's RFC can perform. Contrary to Plaintiff's assertion, the ALJ clearly considered and discussed Plaintiff's obesity, analyzing it under both Section 9.09 of Appendix 1, Subpart P, Regulations No. 4 (repealed after Plaintiff's alleged onset date), as well as SSR 02-1p. Following the standards of SSR 02-1p, the ALJ noted that obesity is no longer considered a disabling impairment on its own, and must now be accompanied by another impairment that either meets or

equals one of the impairments listed in the regulations on its own, or which is elevated to equal an impairment listed in the regulations when it is combined with medically-determined obesity. Even though the ALJ did not specifically state that he was still considering SSR 02-1p, he considered the elements described in this Ruling for evaluating obesity. In particular, the ALJ noted, among other things, that Plaintiff has never had severe pain or limitation of motion of a weight-bearing joint or the lumbosacral spine, chronic venous insufficiency, congestive heart failure, or severe respiratory impairment. Finally, the ALJ noted that obesity was considered by the medical expert in his determination of Plaintiff's RFC. As such, the court finds that the ALJ's consideration of Plaintiff's obesity is consistent with the Regulations and case law and that it is based on substantial evidence on the record.

**C.      The ALJ's Determination of Plaintiff's RFC:**

Plaintiff contends that the ALJ's decision with regard to her RFC is not supported by substantial evidence. In this regard, Plaintiff contends that ALJ did not completely develop a full and fair record because the record was not sufficient to determine whether Plaintiff was disabled. Plaintiff also argues in regard to the ALJ's determination of her RFC, that the ALJ improperly evaluated the medical record including the RFC determinations of Dr. Serota and Dr. Bailey.

The Regulations define RFC as "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). Lauer, the case upon which Plaintiff relies, states that "[w]hen determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." 245 F.3d at 703. Further, "the ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting

McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). See also Anderson v. Shalala, 51 F.3d, 779 (8th Cir. 1995). To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite those impairments. Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" Lauer, 245 F.3d at 704 (quoting Singh, 222 F.3d at 451). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir.2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir.2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Eichelberger, 390 F.3d at 591.

Even though an RFC determination needs to be supported by medical evidence, RFC is nevertheless "an *administrative* assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996) (emphasis added).

"RFC is an issue only at steps 4 and 5 of the sequential evaluation process." Id. at *3. As stated above, at step 4 the claimant has the burden of persuasion to demonstrate his or her RFC. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). "If a claimant establishes [his or] her inability to do past relevant work, then the burden of proof shifts to the Commissioner." Goff, 421 F.3d at 790 (citing Eichelberger, 390 F.3d at 591). However, at step 5, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner." Goff, 421 F.3d at 790. Also, at step 5, where a claimant's RFC is expressed

in terms of exertional categories, it must be determined whether the claimant can do the full range of work at a given exertional level. The claimant must be able to "perform substantially all of the exertional and nonexertional functions required in work at that level. Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level." Id.

Upon making an RFC assessment an ALJ must first identify a claimant's functional limitations or restrictions and then assess his or her work-related abilities on a function-by-function basis. See Masterson, 363 F.3d at 737; Harris v. Barnhart, 356 F.3d 926, 929 (8th Cir. 2004). Upon reviewing Plaintiff's medical records, the ALJ in the matter under consideration found that she had a list of impairments, "but no impairment or combination of impairments that meets or equals in severity the requirements of any impairment listed in Appendix 1, Subpart P, Regulations No. 4." He then considered the record as a whole, including Plaintiff's medical records, the opinions of her physicians, her own subjective complaints of pain, and Plaintiff's credibility based on the factors established in Polaski, to determine that she has the RFC:

> to perform the physical exertional and nonexertional requirements of work except for lifting or carrying more than 10 pounds frequently or more than 20 pounds occasionally; climbing of ropes, ladders, or scaffolds and more than occasional climbing or ramps and stairs; work at unprotected heights or around dangerous moving machinery; and concentrated or excessive exposure to dust, fumes, chemicals, temperature extremes, high humidity or dampness, and other typical allergies, pollutants, and atmospheric irritants. There are no credible, medically-established mental or other nonexertional limitations.

Tr. 28.

Based on this finding, the ALJ found that Plaintiff's ability to perform the full range of light work[4] was reduced by her RFC, but that there are jobs available that Plaintiff can perform.

To the extent that Plaintiff contends that the ALJ's RFC finding is not consistent with Dr. Serota's medical records, letters, and his findings in an RFC Assessment, the court has found above that the ALJ's conclusions regarding Dr. Serota's opinion is supported by substantial evidence and that it is consistent with the case law and Regulations. In regard to Plaintiff's contention that the ALJ erred by rejecting the opinion of Dr. Bailey, Dr. Bailey evaluated Plaintiff's mental status in March 2001. Dr. Bailey did not examine Plaintiff and, as such, his opinion does not constitute substantial evidence. See Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998). See also 20 C.F.R. § § 404.1527(f)(2)(i), 416.927(f)(2)(i) (providing that findings made by non-examining State agency medical consultants are not binding). Further, as stated above, Dr. Bailey reported that Plaintiff's *depression was secondary to her physical and situational concerns.* Situational depression is not disabling. See Dunahoo, 241 F.3d at 1039-40 (holding that depression was situational and not disabling because it was due to denial of food stamps and workers compensation and because there was no evidence that it resulted in significant functional limitations).

The ALJ considered in his second opinion that Plaintiff's only documented treatment for a mental disorder prior to the first decision, spanned only from January 27 to March 1, 2000. The ALJ stated, further, that he could not account for Dr. Bailey's conclusions and Dr. Bailey's stating that his evaluation was "for current"; on a Psychiatric Review Technique form Dr. Baily stated that the date for the assessment was "current." The ALJ stated that he could "only assume that [Dr. Bailey]

---

[4]     The Regulations define light work as 'involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects up to 10 pounds." 20 C.F.R. § 404.1567(b). Additionally, "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251,*6 (SSA).

was overlooking the duration requirement of the Act." Indeed, the Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). In any case, Dr. Bailey reported in the Mental RFC Assessment that Plaintiff was only *moderately limited* in regard to her ability to maintain concentration, in regard to completing a normal work-day without interruption, and in regard to maintaining socially appropriate behavior and that *in all other areas* listed on the Assessment form *Plaintiff was not significantly limited*.

The ALJ reviewed records of Plaintiff's visits to Weaver & Associates Counseling Services. In particular, the ALJ considered that the purpose of Plaintiff's counseling with Weaver & Associates was to treat depression that was caused by situational stressors in Plaintiff's life, and not clinical depression amounting to a mental impairment. See Dunahoo, 241 F.3d at 1039-40. Further, in the second decision, the ALJ reviewed Dr. Larice's records from 2004, concluding from them that even though Plaintiff visited Dr. Larice from time to time complaining of depression and/or anxiety, there was no evidence of suicidal ideation, psychosis, or any profound or uncontrollable thought disorder, and that her mood was pretty stable with medication. Additionally, in his first decision, the ALJ considered that Plaintiff admitted that she has the ability to concentrate sufficient to read many books and that her demeanor at the first hearing reflected "no obvious signs of depression, anxiety, depression, memory loss, or other mental disturbance. The ALJ found, based on the evidence of record, that there is no evidence that Plaintiff suffered from a mental impairment which had lasted or could be expected to last at least 12 months. The court finds that the ALJ's conclusion in regard to

Plaintiff's alleged mental impairment is based on substantial evidence and that it is consistent with the Regulations and case law.

As Plaintiff contends in her brief, it is true that a social security hearing is a non-adversarial proceeding and the ALJ has a duty to fully develop the record. See Ellis, 392 F.3d at 994; Stormo, 377 at 806. "Although that duty may include re-contacting a treating physician for clarification of an opinion, that duty arises only if a crucial issue is undeveloped." Ellis, 392 F.3d at 994. Considering the record as a whole in the matter under consideration the court finds that the ALJ left no issue undeveloped. In summation, the court finds that substantial evidence on the record supports the ALJ's findings in regard to Plaintiff's RFC and that the record was fully developed in this regard.

**D.    Hypothetical Question Posed to the Vocational Expert:**

Plaintiff alleges that the ALJ's hypothetical to the VE was flawed because it did not capture the concrete consequences of Plaintiff's impairments, thereby making the VE's response to the flawed hypothetical question legally insufficient.

If a claimant is found to have non-exertional impairments that diminish the claimant's capacity to perform the full range of jobs listed in the Guidelines, the Commissioner must solicit testimony from a VE to establish that there are jobs in the national economy that the claimant can perform. Reynolds, 82 F.3d at 258. Once a determination is made that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to prove there is work in the economy that the claimant can perform. Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).

Additionally, 20 C.F.R. § 404.1560 states in relevant part in regard to a claimant who is unable to perform past relevant work:

(c) Other work.

(1) If we find that your residual functional capacity is not enough to enable you to do any of your past relevant work, we will use the same residual functional capacity

-53-

assessment we used to decide if you could do your past relevant work when we decide if you can adjust to any other work. We sill look at your ability to adjust to other work by considering your residual functional capacity and your vocational factors of age, education, and work experience. Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country).

(2) In order to support a finding that you are not disabled in this fifth step of the sequential evaluation process, we are responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that you can do, given your residual functional capacity and vocational factors. We are not responsible for providing additional evidence about your residual functional capacity because we will use the same residual functional capacity assessment that we used to determine if you can do your past relevant work.

In regard to the hypotheticals which the ALJ posed to the VE, an ALJ posing a hypothetical to a VE is not required to include all of a claimant's limitations, but only those which he finds credible. Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999) ("In posing hypothetical questions to a vocational expert, an ALJ must include all impairments he finds supported by the administrative record."); Sobania v. Sec'y of Health Educ. & Human Servs., 879 F.2d 441, 445 (8th Cir. 1989); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988). The hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999) (holding that the ALJ need not include additional complaints in the hypothetical not supported by substantial evidence); Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Sobania, 879 F.2d at 445; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Where a hypothetical question precisely sets forth all of the claimant's physical and mental impairments, a vocational expert's testimony constitutes evidence supporting the ALJ's decision. Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990).

Even though a VE does not specifically recite factors in his answers, an ALJ can properly assume that the VE "framed his answers based on the factors the ALJ told him to take into account." Whitehouse v. Sullivan, 949 F.2d 1005, 1006 (8th Cir. 1991). Where an ALJ's hypotheticals include

all of a claimant's impairments as supported by the record and the expert limits his opinion in this regard, an ALJ may rely on the vocational expert's testimony.  Jones v. Chater, 72 F.3d 81, 82 (8th Cir. 1995).

First, the court notes that the ALJ found that Plaintiff did not have any credible mental or other non-exertional limitations. Under such circumstances the ALJ was not required to solicit the testimony of a vocational expert and could have relied solely on the Guidelines. See Reynolds, 82 F.3d at 258.  Nonetheless, the ALJ obtained the testimony of a VE and relied upon that testimony.

Second, the court has found above that the ALJ's determination of Plaintiff's RFC is based on substantial evidence. The ALJ posed a hypothetical to a VE which incorporated this RFC which included the limitations which the ALJ found credible. Based on this hypothetical, the VE at the second hearing testified that Plaintiff would be incapable of performing any of her past relevant work, but that there would still be 2,000 jobs in the St. Louis metro area that Plaintiff could perform, with about 3,000 in Missouri. As such, the court finds that the hypothetical posed to the VE upon which hypothetical the ALJ relied was proper. See Haggard, 175 F.3d at 595; Gilbert, 175 F.3d at 604; Sobania, 879 F.2d at 445; Rautio, 862 F.2d at 180.  Further, by establishing that there are jobs in the economy that Plaintiff can perform, despite her inability to perform her past relevant work, the court finds that the Commissioner satisfied his burden of production to show that there are jobs that Plaintiff is capable of performing. Additionally, the court finds that the decision of the ALJ in regard to the hypothetical posed to the VE is based on substantial evidence and that it is consistent with the case law and Regulations.

## VII.
## CONCLUSION

For the reasons articulated above, the court finds that the decision of the ALJ is supported by substantial evidence on the record as a whole and that the Commissioner's decision, therefore, should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in her Brief in Support of Complaint is **DENIED**; Doc. 15.

**IT IS FURTHER ORDERED** that separate Judgment shall be entered in favor of Defendant and against Plaintiff in the instant cause of action and incorporating this Memorandum Opinion.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 2nd day of September, 2008.